IN THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

EL PASO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
|     Plaintiff, | § | |
| v. | § | NO.  NO. EP-04-CR-2091(4)-KC |
| | § | |
| FLORITA TOLENTINO, | § | |
| | § | |
|     Defendant. | § | |

**<u>DEFENDANT FLORITA TOLENTINO'S
SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF
RULE 29(a) MOTION FOR JUDGMENTS OF ACQUITTAL</u>**

TO THE HONORABLE KATHLEEN CARDONE, UNITED STATES DISTRICT JUDGE FOR THE WESTERN DISTRICT OF TEXAS

    Comes now the Defendant, FLORITA TOLENTINO, who by and through her undersigned counsel, JOSEPH (SIB) ABRAHAM, JR., files the following Supplemental Memorandum of Law in Support of her Motion for Judgments of Acquittal, orally made at the conclusion of the Government's case-in-chief:

**I.**

**DISCUSSION**

    In response to this Honorable Court's Order addressing the "in violation of law" issue, the Defendant submits that an initial review of the H1-B visa process is appropriate, since the

genesis of the Government's case is that the Defendant committed, and conspired to commit, various alien smuggling crimes in violation of 8 U.S.C. §1324.

    a.    **The H1-B Visa Process**[1]

For many large urban districts and southern border cities in America enjoying steady population growth, the solution for the chronic teacher shortage was the "permanent substitute" – non-education-degreed adults with little or no experience in teaching. Year after year, surveys across America showed steady declines in classroom performances whenever the teacher of record was a substitute.

With the pressure of statewide tests at almost all grade levels coming to bear on school administrators and principals, the focus shifted to teacher improvement and ultimately, to out of state teacher recruiting.

OMNI offered school districts, which had experienced shortages in high-need areas such as math, science, and special education, mature, experienced, motivated, education-degreed teachers (60% of whom have completed a masteral theses), at no cost to the district. These teachers fit the requirements because they have trained under an educational system identical to the American system and they more often than not bore credentials superior to those possessed by the limited pool of United States Applicants.

The process of hiring these teachers is not at all simple, nor is it need-blind, non-specific, arms-length, or impersonal. School officials have insisted on interviewing applicants in person (either via phone conference or face to face – the latter proving more effective for gauging an applicant's suitability for the job), and then eventually hiring only those professionals that meet

---

[1] The Government has asserted that the H1-B visas issued in the case at bar were based, <u>ab</u> <u>initio</u>, on fraud. However, that proof of fraud, which involves a <u>means</u> <u>rea</u> of specific intent as opposed to a general intent, is totally lacking. Moreover, the Government never offered proof of what is necessary to obtain an H1-B visa, so how can the evidence sustain any violation thereof?

their district's needs and criteria, and only after perusing numerous United States institution-validated files of qualified candidates. The manner in which a school district could hire these foreign teachers is through the H1-B working visa petition. The process begins when a school district committee on Human Resources ("H.R.") decides to address their teacher shortage problems through the recruitment of foreign-educated teaching professionals. Typically the administrative head of Personnel presents a motion to the school board that the H.R. department intends to travel to the Philippines to interview and hire teaching staff for the coming school year. Upon the motion's approval by the school board, a group of senior H.R. personnel and principals are selected by the board and authorized to travel to conduct the interview. OMNI then arranges an interview usually lasting the number of days (typically no more than five) it would take for the district authorized school officials to feasibly interview and select the district-approved number of teachers necessary to fill their positions. This entails handling travel, lodging, meals, itinerary and security details on top of the actual interview schedules and itineraries for the school district delegates. Literally hundreds of pre-screened and pre-qualified teachers are interviewed by the delegates. After much deliberation the select few who meet the criteria are handed <u>letters of intent to hire and/or probationary contracts</u> by the same group of delegates, on behalf of their school district. An H1-B visa (<u>by statute, 8 U.S.C. §1101(a)(15)(H)</u>, is a visa for "an alien … coming temporarily to the United States to perform services … in a specialty occupation … who meets the requirements for the occupation specified in section 214(i)(2) …. A "specialty occupation" is defined in section 214(i) of the INA, 8 U.S. §1184(i), as "an occupation that requires – (A) theoretical and practical application of a body of highly specialized knowledge; and (B) attainment of a bachelor's degree or higher degree in a specific specialty (or its equivalent) as a minimum for entry into the occupation in the United States." A

school district (the employer or 'sponsor') petitions the United States government, through the Bureau of Citizenship and Immigration Services ("BCIS"), to hire a teacher.  The teacher is the beneficiary of the employer's petition.  And prior to filing the H1-B petition with the immigration authorities, the petitioning school district must file an "LCA" (Labor Condition Application) (20 CFR, part 655) with the Department of Labor ("DOL") Employment and Training Administration.

The school districts certifies to the DOL in advance of filing the H1-B petition, that it has a legitimate position open, has agreed to pay the prevailing wage for the occupation (or the actual wage paid to others if higher than the prevailing wage); will provide working conditions to the sponsored aliens that are equivalent to those provided American workers, that there is not a strike in progress (i.e. that the foreign workers will not be strikebreakers); and that notice of the H1-B employment and rate of pay have been given to other members of the workers through posting at job sites.

The employing school district completes and signs a form ETA 9035 with the above attestations on it, and files it with the Labor Department.  It is filed by fax.  The DOL official "certifies" the form, and faxes it back to the employer, who attaches a copy of the H1-B petition it files with the immigration authorities together with supporting documents and filing fees.  The BCIS, upon approving the petition sends a copy to the consular office geographically closest to the beneficiary and an original copy to the attorney and petitioning school district.  The beneficiary then applies for a consular stamp of the H1-B on his passport.  Other documents such as a police report, health examination reports, proof of inoculations, etc., are submitted to the Consular office before interviews/approval.

When approved by the American Consulate, the beneficiary seeks to approve exit visas from the Philippine agency overseeing overseas employment.

When approved by the Philippine government agency – the teacher is ready to go.

A casual reading of how much effort it takes to petition a school teacher from the Philippines to work in a school district in the United States reveals.

1.  The teacher has NO role in the petition process and could not be accused of fraudulently-procuring visa or entry documents.

2.  Omni principals or employees were not proven to have fraudulently prepared any of the documents because the employer, the school district, attested to comply with all the requirements and all the filing and reporting obligations mandated by statute. Omni, in its role in facilitating the paperwork, did not alter any of the paperwork the school district signed off on.

3.  Omni nor any of its principals and employees were not proven to be guilty of encouraging and inducing aliens to come, enter, and reside in the United States, because, quite simply OMNI DID NOT CHOOSE WHO GOT HIRED AND WHO GOT TO GO TO THE UNITED STATES. THE EMPLOYER DID.

4.  Omni principals and employees cannot possibly be held liable for any conduct approaching that of "encouraging and inducing" because as the statute provides:

> "Any person who encourages or induces an alien to come to, enter, or resides in the United States … implies active conduct on the part of the violator to effect the essential elements of coming, entering, and residing in the United States.

**b.  Lawful Entry Into the United States**

The Government contends, as previously noted, that the H1-B visas were issued due to fraud by the Defendant, but the requisite intent to defraud has not been sufficiently shown because the Defendant must have acted knowingly and with the specific intent to deceive. That

can be shown if the H1-B visas "process" involved false representations, i.e., they constitute half-truths or effectively omit or conceal a material fact made with intent to defraud. Clearly, that is not the case nor is the Government's reliance on <u>United States v. Gasanova</u>, 332, F.3d 297 (5th Cir. 2003), well founded. <u>Gasanova</u> was a UTEP professor who completed applications for three women to receive J-1 visas as academic researchers. The women, instead, worked as topless dancers in El Paso between 1998 to 2001 and earned approximately $500,000 during the period, most of which went to the <u>Gasanovas</u>. It was not disputed that the Gasanovas "brought in" the women (he escorted them into the United States) for the purpose of financial gain. The core legal issue of the case was whether they did these things knowing or in reckless disregard of the fact that the women did not receive prior official visas, issued by proper government authority, were in fact evidence that they had received prior official authorizations.

The Fifth Circuit admitted that section 1324(a)(2) does not define "official authorization" and "no court which (they) are aware has construed the statute to meet their question." Further, the Fifth Circuit asserted that "to construe official authorization as including a document the defendant knows to be mistakenly issued and fraudulently obtained would thwart the objective of the Immigration Reform and Control Act (IRCA)". Interestingly, the Court did not define "official authorization" and did not invoke INA 212(a)(6)(---) in its deliberation. They did not have to because, as Judge Reavley succinctly noted in the panel opinion:

> "The Gasanovas quarrel with an isolated statement of the court in instructing the jury, saying that 'bringing aliens who are not admissible into the United States is a violation of Title 8, United States Code, Section 1324, even if the aliens, have the documents for entry'. This is incorrect, but the Gasanovas <u>concede that they knew the women were inadmissible, and, as we interpret §1324(a)(2), to concede knowledge of inadmissibility is to concede knowledge of lack of judicial authorization</u>. The instruction was harmless". (emphasis added). 332 F.3d at 300.

In the case at bar, there is no prima facie evidence of the illegal status of the alien teachers. They had received H1-B visa approvals from the United States Consular Offices in Manila, Philippines. Moreover, the Defendant was not the petitioner who sought the issuance of the H1-B visas – it was the respective school district who petitioned for their visas. Consequently, once a visa is issued, it was not a violation for the teachers to be in the United States nor were they here in violation of any law. Either an alien (with or without proper documents) comes to and enters the United States without immigration inspection (a violation of 8 U.S.C. §1324(a)(1)(A)(i)), or an alien comes to a proper inspection station without prior official documentation (i.e. no visa documents).

The absence of a visa or other document "required for entry" is a condition to being "in violation of the law." The Defendant is and has always been consciously aware that the teachers have been issued visas and other proper entry documents and that they are in the country legally. The following facts support this contention and for her Motion for Judgment of Acquittal as to these counts because the evidence presented by the Government established that: (1) H1-B visas and other entry documents were issued to the teachers; (2) none of the visas had expired or been rescinded by any of the petitioner school districts; (3) the immigration agents at the port(s) of entry allowed all the teachers to enter after viewing the documents they had in their possession – not one teacher was arrested, detained or deported; and (4) even after the Government agents raided the dwelling of the teachers on August 26, 2003, and interviewed them and inspected their documents and passports, no one was arrested or detained.[2]

---

[2] In United States v. Once Chrysler Dynasty, VIN 1CBN4635, 1993 WL210677 (9th Cir. 1993) (unpublished opinion), prior official authorization was defined as follows:
> "At issue is whether Zeenan Nurani had prior official authorization to come to the United States … The visa constitutes "prior official authorization" for the alien to come to the United States port of entry and apply for admission"

Since not one individual possessing an H1-B visa has been arrested, deported, or detained, it is presumed that they were in the United States legally and not in violation of law. Having established that, how can the Defendant be guilty of any "alien offense" when the aliens were here lawfully? The answer is painfully obvious. Moreover, the fact that the respective petitioning employer may have changed is also not a violation of the law. In Matter of Morgan, 13 I & N Del. 283 (BIA 1969), the applicant (a native of Jamaica) applied for admission into the United States based on an immigrant visa supported by certification from the Secretary of Labor. The document showed she was destined to a Mrs. Volkerding of Louisville, Kentucky for employment as a "live-in" domestic but Morgan told the examining officer she was en route to Columbus, Ohio to work for a Mrs. Moore (obviously a new employer) as a "live-in" domestic. Because of the different destination and new employer, the applicant's inspection resulted in a referral of her case for an exclusion hearing where indeed, she was ordered excluded and deported from the United States. The Board of Immigration Appeals reversed her deportation and ordered her reinstated and authorized her admission:

> "The applicant learned she was to work for Mrs. Moore, not Mrs. Volkerding, only after she had obtained her immigrant visa. She did not then inform the visa-issuing consul of the change because the "arranging" travel agent told her everything was all right and she could properly proceed to the United States. In this connection, the special inquiry officer has found absolutely no evidence of fraud on the applicant's part, and he is of the opinion she had no reason to doubt the information she was given. Accordingly, we are confronted only with the problem of the validity of the applicant's labor certification at the time of her application for admission. Under the circumstances outlined above, hers is a continuing application, which persists to the present moment. It is not definitely affected by the special inquiry officer's ruling. See 8 CFR 3.6. Thus, the facts as they now exist are determinative of the issue raised there, Klapholz v. Esperdy, 302 F.2d 928 (2 Cir. 1962) cert. denied 371 U.S. 891; cf. Matter of Pfahler, 12 I & N Dec. 114 (B.I.A., 1967)"

In the instant case, many teachers, with valid H1-B visas learned that they may not be working for the school district which had petitioned them. Nevertheless, they were hired by

other school districts doing the same job they were petitioned to come to the United States to do within the time period reflected in their H1-B visa. And unlike the situation in Morgan where the employer/petitioner was not prosecuted, none of the teachers here were detained, arrested, or excluded as was the case with Ms. Morgan (see Exhibit "A" Matter of Morgan).

      c.      **Who has the Duty to Notify INS?**

Does the teacher have any obligation to notify INS? The rules do not so indicate. The statutory scheme imposes the duty on the petitioner-sponsor School District.[3] It does not impose any duty on a placement agency such as Omni or the Defendant.

INS Regulation imposes a duty. The sponsor-petitioner is to file an amended or new I-129 petition to reflect material changes in the terms or conditions of employment of the training or the alien's eligibility as specified in the original petition. See 8 CFR §214.2(b)(2)(E).

The integrated Labor Department Regulations provide that a termination of employment status will not be considered bona fide unless the INS has been notified of the termination, and if required, return transportation is provided. See 65 CFR 80.110 80171 (Dec. 20, 2000). The employer is considered liable for the offered salary until the INS is notified of the termination of an H1-B employee. 20 CFR §665.731(c)(7)(i), 8 CFR §214.2(b)(11)(i)(A). This regulation is an important part of this case.

Cutting across the above is the fact that the culpable school districts did not even notify INS to terminate the notice of action. Consequently, no "out-of-status" counting can even start.

---

[3] The Government, in its Supplemental Response to Defendants' Motions for Acquittal, suggests that the school district administrators were "clueless" as to how the immigration aspects of hiring a foreign teacher worked and that they relied solely on the Defendants. This argument is without merit. School district administrators are and/or should be acutely aware of the hiring process of a foreign teacher – that is part of their job responsibilities. Do taxpayers charged with tax evasion escape liability because they are not CPA's or accountants? Of course not. The same principle applies to school administrators in petitioning for foreign teachers and/or renewing or rescinding those same job offers.

The case law shows that if the teacher does not work or commit crime, a job sponsorship failure will not terminate the visa status. The teacher can remain and when a job is found, the new sponsor can re-petition INS as long as the petition is filed prior to the time the visa expires. If the petition is granted, the notice of action related back even if the notice of action is issued after the visa time expires.

## CONCLUSION

Based on the foregoing, the Defendant submits that there has not been a sufficient showing of what "violation of law" was committed let alone that it was committed with any requisite intent of fraud.[4]

Respectfully submitted,

_____
JOSEPH (SIB) ABRAHAM, JR.
Attorney for Defendant
State Bar No. 00821000
P.O. Box 512312
El Paso, Texas 79951-0004
Tel. (915)544-7860
Fax (915)532-4768

---

[4] The Defendant adopts all arguments and authorities, not advanced herein, that are made by Defendant Angelica Tolentino and any other co-defendant.

CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this the 13th of March, 2007, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and service to all CM/ECF registrants.

_____
JOSEPH (SIB) ABRAHAM, JR.